IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

EDWARD KOEHL,

                              Plaintiff,

        v.                                          Civil Action No.
                                                    9:05-CV-0582 (DNH/DEP)
GARY GREENE, Superintendent, *et al.,*

                              Defendants.

_____

APPEARANCES:                        OF COUNSEL:

FOR PLAINTIFF:

EDWARD KOEHL, *Pro Se*
94-A-2890
Clinton Correctional Facility
P.O. Box 2001
Dannemora, NY 12929

FOR DEFENDANTS:

HON. ANDREW M. CUOMO            CHARLES J. QUACKENBUSH, ESQ.
Attorney General of the State   JAMES B. McGOWAN, ESQ.
  of New York                   Assistant Attorneys General
The Capitol
Albany, NY 12224-0341

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

        Plaintiff Edward Koehl, a New York State prison inmate who is

proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983 claiming deprivation of his civil rights.  In his complaint plaintiff asserts an array of claims centered upon his efforts, beginning in or about April of 2003, to convert to Judaism and a delay in processing that request and, correspondingly, in permitting him to attend congregate Jewish religious services, celebrate religious holidays, and receive meals consistent with a kosher diet.  Plaintiff also asserts that various of the defendants have verbally harassed and directed derogatory comments toward him, based upon his new-found religion, and that prison officials, responding to the many grievances filed by him to address the situation, failed to conduct proper investigations and remediate the constitutional violations.  Plaintiff's complaint seeks injunctive relief, as well as awards of compensatory and punitive damages.

Currently pending before the court is a motion filed by the defendants seeking the entry of summary judgment dismissing plaintiff's claims on a variety of grounds.  In their motion, *inter alia,* defendants assert that no reasonable factfinder could conclude that plaintiff's First Amendment religious exercise rights were violated, that plaintiff's claims concerning the issuance of false misbehavior reports and verbal

2

harassment are not cognizable, and that plaintiff's conspiracy claims are precluded by the intra-corporate conspiracy doctrine, additionally asserting their entitlement to qualified immunity.  Based upon a careful review of the evidence now before the court, I recommend that defendants' motion be granted.

I.    BACKGROUND[1]

Plaintiff is a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"); while he is currently confined elsewhere, at the times relevant to his claims in this action Koehl was designated to the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York.[2]  *See generally* Complaint (Dkt. No. 1).

The events giving rise to a majority of plaintiff's claims were set in motion in April of 2003, when plaintiff initiated efforts to convert to the Jewish faith.  Complaint (Dkt. No. 1) ¶ 1.  After not having received an

---

[1]    In light of the procedural posture of the case, the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff.  *See Wells-Williams v. Kingsboro Psychiatric Ctr.*, No. 03-CV-134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007) (citations omitted).

[2]    Plaintiff was transferred out of Great Meadow on or about March 26, 2007, and is currently housed in the Clinton Correctional Facility.  *See* Dkt. Nos. 83, 84.

3

acceptable response to that request from defendant J. Kellman, the designated Rabbi at Great Meadow, plaintiff went to the Catholic Chaplin at the facility in August of 2003 to make arrangements for the change in religious preference. *Id.* ¶ 2.

According to the defendants, religious matters such as conversion requests are generally left to prison chaplain staff, with minimum input from security personnel.  Greene Decl. (Dkt. No. 99-3) ¶ 7.  Defendants attribute the delay in Rabbi Kellman acting on Koehl's conversion request to the cleric's practice of interviewing inmates to determine the level of their sincerity in converting to the Jewish religion, and the fact that those interviews were conducted only once each month.[3] *Id.* ¶ 6.

Hand-in-hand with his request to convert to the Jewish faith, plaintiff undertook efforts to receive kosher meals, also beginning on or about August 13, 2003.  Complaint (Dkt. No. 1) ¶¶ 3-7.  Subsequent inquiries by Koehl regarding the status of that request were met with verbal

---

[3]     It appears from materials now before the court that Rabbi Kellman's procedures did not conform to DOCS policy, which provides for self designation by inmates of their religious preferences subject to certain limitations and restrictions as to when and how often such designations may be made.  *See* DOCS Directive No. 4202; *see also* Greene Decl. (Dkt. No. 9903) Exh. C.  Such violations of state regulation, however, do not in and of themselves arise to a level sufficient to support a civil rights claim under 42 U.S.C. § 1983.  *Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985).

harassment and derogatory epithets on the part of various DOCS employees, including Corrections Sergeant C. Lacroix, Corrections Officer Bruce Parker, and facility cook Greg Lyons.[4]  Complaint (Dkt. No. 1) ¶ 3. Plaintiff was approved for a kosher diet on August 21, 2003.  Complaint (Dkt. No. 1) ¶ 7.

Plaintiff asserts that corrections officials also ignored his repeated requests in August, September and October, 2003 that he be permitted to attend Jewish religious services, including those held to celebrate Rosh Hashanah and the Sukkoth holiday.  Complaint (Dkt. No. 1) ¶¶ 8-14 and Exhs. 2, 4.  Once Koehl was interviewed by Rabbi Kellman on October 30, 2003, he was thereafter added to the call out list in order to permit him to attend Jewish services.[5]  *Id.* ¶ 32.

_____

[4]      The evidence in the record regarding this portion of plaintiff's claim is sharply conflicting.  In his opposition to defendants' motion, plaintiff has submitted statements from various inmates tending to substantiate his allegations regarding the offensive statements on the part of prison officials.  *See* Plaintiff's Opposition (Dkt. No. 105-2) Exhibits at pp. 6-8; *see also* Plaintiff's Opposition (Dkt. No. 105-3) Exhibits at pp. 3, 5, 7, 9-11.  The three defendants implicated, by contrast, have submitted sworn statements in which they deny their use of such language toward the plaintiff.  Lyons Decl. (Dkt. No. 99-5) ¶ 3; Parker Decl. (Dkt. No. 99-7) ¶ 2; Lacroix Decl. (Dkt. No. 99-4) ¶ 2.

[5]      According to an interdepartmental communication dated January 21, 2004, the requirement of call out to attend Jewish services has been eliminated at Great Meadow.  Greene Decl. (Dkt. No. 99-3) Exh. D.  Notwithstanding the elimination of this call out requirement, among plaintiff's claims is his contention that he was not placed on a call out list to attend Jewish Purim services held on March 4, 2004.  *See* Complaint (Dkt. No. 1) ¶ 46.

Among the events triggering plaintiff's claims was the issuance by Defendant Lacroix of a misbehavior report to the plaintiff on October 14, 2003, accusing him of various prison disciplinary rule infractions, including soliciting goods (Rule 103.20), theft (Rule 116.10) and violating mess hall serving policies (Rule 124.16).  Complaint (Dkt. No. 1) ¶ 15; Greene Decl. (Dkt. No. 99-3) Exh. E.  Those disciplinary charges arose from an incident occurring in the Great Meadow mess hall, when it was discovered that plaintiff was in possession of a hamburger, located inside of his food bag, that was not served as part of his special, cold alternative diet.  *Id.; see also* Lacroix Decl. (Dkt. No. 99-4) ¶ 4.  At a Tier II hearing convened on October 17, 2003 by Corrections Lieutenant Eastman to address those charges, plaintiff admitted having violated mess hall policies, but denied the remaining two accusations against him.[6]  Greene Decl. (Dkt. No. 99-3) Exh. E.  Following that hearing plaintiff was found guilty of the mess hall violation charge but acquitted of the remaining two, and a penalty which

---

[6]     The DOCS conducts three types of inmate disciplinary hearings.  Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges.  Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU).  Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits.  *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (1998).

was limited to loss of recreation privileges for a period of seven days was

imposed.  *Id.*  That hearing officer's determination was later upheld on

appeal by the superintendent's designee, Deputy Superintendent

Carpenter, apparently based upon plaintiff's admission of guilt with

respect to the charge for which he was convicted.  Greene Decl. (Dkt. No.

99-3) ¶ 8 and Exh. E.

      While the majority of plaintiff's claims surround his efforts at

securing the requisite approval for conversion and a kosher diet, as well

as the misbehavior report issued in October 2003, his complaint also

addresses various other matters.  Plaintiff further asserts that in January

of 2005 defendants Lyons and Pagano verbally harassed him, making

pointed and abusive reference to his religious beliefs.  Complaint (Dkt. No.

1) ¶¶ 52-53.  Plaintiff additionally alleges that on January 13, 2005 he was

issued a false misbehavior report by defendant Lyons, related to the

requirement that he sign a written acknowledgment of receipt of his

kosher meals.  *Id.* ¶ 54.  That misbehavior report related to DOCS

Directive No. 4310, which provides that inmates receiving cold alternative

diets must daily attend every meal, and sign an acknowledgment receipt

of each meal.  Pagano Decl. (Dkt. No. 99-6) ¶ 7 and Exh. A.  The

misbehavior report alleged that on January 13, 2005, during a period when he was receiving a cold alternative diet, plaintiff did not appear for breakfast but when attending lunch on that day, signed for having received both breakfast and lunch, in violation of the governing policy.[7] Lyons Decl. (Dkt. No. 99-5) ¶¶ 6-7 and Exh. A.  In light of this violation and the fact that plaintiff had been warned on other occasions concerning compliance with the meal attendance policies, plaintiff was removed from the cold alternative diet on January 13, 2005, but later reinstated effective January 21, 2005.  Pagano Decl. (Dkt. No. 99-6) ¶¶ 9-13.

The balance of plaintiff's claims, as set forth in his complaint, concern the many grievances filed by him in complaining of various prison conditions and matters set forth in this complaint.  Plaintiff's complaint identifies seven grievances filed to address various matters now raised. The first of those, grievance no. 34934-03, was filed on August 13, 2003 to challenge the refusal of religious officials to honor Koehl's request for conversion.  Complaint (Dkt. No. 1) ¶ 4.  Following Rabbi Kellman's failure to respond to plaintiff's allegations during the course of the investigation,

---

[7]        Despite apparently admitting during an ensuing hearing that he did in fact attempt to sign for a breakfast which he did not attend, *see* Lyons Decl. (Dkt. No. 99-5) ¶ 10 and Exh. C, plaintiff now alleges in his complaint that the misbehavior report issued was "false".  *See* Complaint (Dkt. No. 1) ¶ 54.

Superintendent Greene submitted a response advising plaintiff that he was listed as Jewish, but failing to respond to the allegations that he was being denied ongoing access to religious services. *Id.* ¶¶ 5, 10-11. On appeal to the DOCS Central Office Review Committee (the "CORC"), Superintendent Greene's decision was upheld. *Id.* ¶¶ 13, 25.

Plaintiff filed a second grievance, no. 35021-03, on September 29, 2003, also addressing the failure of Rabbi Kellman and Superintendent Greene to accommodate his religious beliefs. Complaint (Dkt. No. 1) ¶12. Upon refusal of both the Inmate Grievance Review Committee ("IGRC") and Superintendent Greene to respond to that grievance within the required timeframe, plaintiff appealed the matter to the CORC.[8] *Id.* ¶¶ 17, 29. On December 9, 2003 plaintiff received a decision from the CORC denying the relief requested in his second grievance. *Id.* ¶ 37.

A third grievance, no. 35069-03, was submitted by Koehl on October 15, 2003, claiming that he should not have been held responsible for the hamburger discovered in his lunch bag on the previous day. Complaint (Dkt. No. 1) ¶ 16. While the IGRC initially rendered a decision in plaintiff's

---

[8]        Following that appeal plaintiff received Superintendent Greene's decision in connection with grievance no. 35021-03 on November 4, 2003. Complaint (Dkt. No. 1) ¶ 32. Plaintiff lodged an objection to that response, arguing that it was untimely. *Id.* ¶ 33.

favor regarding that grievance on October 24, 2003, Superintendent

Greene issued a decision denying the grievance on November 1, 2003.

*Id.* ¶¶ 27, 30.  Superintendent Greene's decision was upheld on appeal to

the CORC by decision issued on December 9, 2003.  *Id.* ¶ 36.

On January 13, 2004 plaintiff filed grievance no. 35469-04,

complaining of harassment received from defendant Lyons allegedly on

the basis of plaintiff's religious beliefs.  Complaint (Dkt. No. 1) ¶ 38.  That

grievance was transferred by the IGRC to Superintendent Greene who,

following an investigation, issued a decision on February 13, 2004 denying

it.  *Id.* ¶¶ 39-41.  That determination was upheld by the CORC on

February 13, 2004.  *Id.* ¶ 42.

Plaintiff's fifth relevant grievance, no. 35669-04, was filed on

February 16, 2004 complaining of prison mess hall practices, and in

particular contending that Jewish inmates were forced to violate their

sincerely held religious beliefs as a result of the Kosher diet at the facility.

Complaint (Dkt. No. 1) ¶ 43.  On March 22, 2004, after Koehl complained

to the CORC and Commissioner Goord regarding the delay in processing

that grievance, Superintendent Greene issued a decision denying the

relief requested.  *Id.* ¶¶ 47-49.  That determination was upheld by the

CORC on April 24, 2004.  *Id.* at ¶ 51.

On January 13, 2005 plaintiff filed grievance no. 37637-05, complaining of harassment by defendant Lyons extending over a period of more than a year.  Complaint (Dkt. No. 1) ¶ 55 and Exh. 8.  That grievance was assigned to defendant Potter for investigation, resulting in the submission on January 24, 2005 of a report which, plaintiff maintains, was fabricated and based upon perjured statements.  *Id.* ¶¶ 59, 62.  The report from defendant Potter was appealed to the CORC, which denied the grievance basing its decision on the Potter report.  *Id.* ¶ 64.

The seventh and final grievance specifically identified in plaintiff's complaint, no. 37674-05, was filed on January 18, 2005, complaining of his removal from his prescribed religious kosher diet.  Complaint (Dkt. No. 1) ¶ 58 and Exh. 10.  That grievance resulted in a decision from both the IGRC, and later defendant Greene and the CORC, finding that plaintiff had in fact been impermissibly removed from the list of those receiving a religious diet and ordering his reinstatement.  *Id.* ¶¶ 63, 65.

Plaintiff alleges that during the course of investigating and deciding his various grievances the defendants and other prison officials failed to properly investigate and decide those matters.

11

II.   <u>PROCEDURAL HISTORY</u>

Plaintiff commenced this action on May 12, 2005.  Dkt. No. 1.
Plaintiff's complaint asserts various claims, grouped into two denominated
causes of action, alleging deprivation of his First Amendment right to
freely exercise his chosen religion; violation of The Religious Land Use
and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §2000cc-1 *et
seq.*; unlawful retaliation; deprivation of due process; harassment; cruel
and unusual punishment; and conspiracy.  Named as defendants in the
action are Great Meadow Superintendent Gary Greene; Jay Kellman, the
Rabbi assigned to the facility; Deputy Superintendent R.W. Potter;
Corrections Sergeant S. Lacroix; Corrections Officer Bruce Parker; Facility
Cook Greg Lyons; and James Pagano, whose position at Great Meadow
is designated by the plaintiff as "CFFA2."  Complaint (Dkt. No. 1) ¶ 3.
Following the joinder of issue, Dkt. Nos. 32, 41, and a somewhat tortured
procedural history which has included, *inter alia,* the denial of a motion by
the plaintiff for preliminary injunction, Dkt. No. 43, an interim appeal, later
dismissed by the United States Court of Appeals for the Second Circuit,
Dkt. Nos. 50, 79, a mandamus petition, also filed by the plaintiff with that
court, Dkt. No. 94, and the completion of discovery, on October 26, 2007,

defendants moved seeking the entry of summary judgment dismissing plaintiff's complaint in its entirety. Dkt. No. 99. In their motion, defendants argue that 1) plaintiff's claims of verbal harassment are not actionable; 2) any request by Koehl for the entry of injunctive relief is moot, based upon his transfer out of Great Meadow; 3) plaintiff's claim of conspiracy is barred by the intracorporate conspiracy doctrine; 4) plaintiff's claim of retaliation is lacking in merit; 5) plaintiff's claim against the defendants alleging interference with his right to exercise his chosen religion fails to state an actionable constitutional violation; 6) plaintiff is precluded from recovering compensatory damages, based upon his failure to allege and prove the existence of physical injury; and 7) in any event, defendants are entitled to qualified immunity. *Id.* Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 105, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).[9] *See also* Fed. R. Civ. P. 72(b).

---

[9] By letter dated February 6, 2008 defendants' counsel urged the court to reject plaintiff's summary judgment response as both insufficient and untimely. Dkt. No. 103. In light of the circumstances detailed in plaintiff's response to that letter, *see* Dkt. No. 107, and in deference to his *pro se* status, I have nonetheless considered his submissions in opposition to defendants' motion. *See, e.g., Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006).

III.   DISCUSSION

A.   Summary Judgment Standard

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Insurance Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if "it might affect the outcome of the suit under governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys*, 426 F.3d at 553 (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts."

14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n. 4; *Security Insurance*, 391 F.3d at 83.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright*, 132 F.3d at 137-38.  Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d

Cir. 2002) (citation omitted); *see also Anderson*, 477 U.S. at 250, 106 S.

Ct. at 2511 (summary judgment is appropriate only when "there can be

but one reasonable conclusion as to the verdict.").

      B.    <u>Religious Interference</u>

The centerpiece of plaintiff's complaint is his claim that through their

actions, perhaps better characterized as inaction, prison officials at Great

Meadow interfered with his First Amendment right to freely exercise his

religion of choice.  That claim encompasses both the delay in answering

his request for conversion to the Jewish faith and the resulting denial of

his opportunity to participate in congregate services and religious

observances, as well as the corresponding delay in arranging for him to

receive prison meals consistent with his religious beliefs.  The religious

exercise claim also extends to the brief withholding in January of 2005 of

plaintiff's cold alternative diet, based upon his violation of prison mess hall

policies.

The First Amendment to the United States Constitution guarantees a

right to the free exercise of religion.[10]  U.S. Const. amend. I; *Cutter v.*

---

[10]    That amendment provides, in pertinent part, that "Congress shall make
no law respecting an establishment of religion, or prohibiting the free exercise thereof."
U.S. Const. amend. I.

*Wilkinson*, 544 U.S. 709, 719, 125 S. Ct. 2113, 2020 (2005).  As is true with regard to the First Amendment generally, the free exercise clause applies to prison inmates, subject to appropriate limiting factors.  *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) ("Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause.") (citing *Pell v. Procunier,* 417 U.S. 817, 822, 94 S. Ct. 2800, 2804 (1974)).  Thus, for example, under accepted free exercise jurisprudence inmates are guaranteed the right to participate in congregate religious services under most circumstances.  *See*, *e.g.*, *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993) (citing cases).

The right of prison inmates to exercise their religious beliefs, however, is neither absolute nor unbridled, but instead is subject to valid penological concerns, including those relating to institutional security.  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S. Ct. 2400, 2404 (1987); *Salahuddin*, 993 F.2d at 308.  A determination of whether the refusal to permit attendance at a religious service, for example, has abridged an inmate's constitutional rights hinges upon the balancing of the inmate's First Amendment free exercise right against institutional needs of

17

officials tasked with the increasingly daunting task of operating prison facilities; that determination is "one of reasonableness, taking into account whether the particular [act] affecting [the] constitutional right . . . is 'reasonably related to legitimate penological interests.'" *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir.) (quoting *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987)), *cert. denied*, 498 U.S. 951, 111 S. Ct. 372 (1990).

Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, an inmate's diet and participation in religious meals. *McEachin v. McGuinnis,* 357 F.3d 197, 204-05 (2d Cir. 2004); *Ford,* 352 F.3d at 597. Ordinarily the Eighth Amendment establishes as a constitutional minimum the requirement that inmates be provided with nutritionally adequate meals; provided this threshold is met, prison officials otherwise retain considerable discretion in determining dietary constituents. *Word v. Croce,* 169 F. Supp. 2d 219, 226 (S.D.N.Y. 2001). This requirement, however, is augmented by the First Amendment's free exercise clause, which is broad enough to include an inmate's "clearly established" right "to a diet consistent with his or her

religious scruples." *Ford*, 352 F.3d at 597; *see also Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992). "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin*, 357 F.3d at 203. As one might imagine, a free exercise claim arising from such a denial often brings into focus the tension between the right of prison inmates to freely enjoy and exercise their religious beliefs on the one hand, and the necessity of prison officials to further legitimate penological interests on the other. *See Benjamin,* 905 F. 2d at 574.

Examination of plaintiff's free exercise claim entails application of a three-part, burden shifting framework. *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988). A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes his or her sincerely held religious beliefs.[11] *Salahuddin v. Goord,* 467 F.3d 263, 274-

---

[11]    Noting in its decision in *Ford v. McGinnis* a circuit split over whether prisoners must demonstrate that a burden on their religious exercise is substantial in order to establish a free exercise claim, the Second Circuit declined to resolve the issue, instead assuming continued applicability of the substantial burden test. 352 F.3d 582, 592-93 (2d Cir. 2003). Recent cases from this and other courts suggest that the Second Circuit resolved this split in its decision in *Salahuddin v. Goord,* 467 F.3d 263 (2d Cir. 2006) by subscribing to the substantial burden test. *See, e.g., Livingston v. Griffin,* No. 9:04-CV-00607, 2007 WL 1500382, at *15 (N.D.N.Y. May 21, 2007) (Singleton, J.); *King v. Bennett,* No. 02-CV-349, 2007 WL1017102, at *4 (W.D.N.Y. Mar. 30, 2007). While harboring some doubt that the Second Circuit has in fact laid the matter to rest, I find it unnecessary to take a stance regarding the issue.

75 (2d Cir. 2006); *King v. Bennett,* No. 02-CV-349, 2007 WL 1017102, at

*4 (W.D.N.Y. Mar. 30, 2007).  Importantly, in evaluating this factor the

court must be wary of "question[ing] the centrality of particular beliefs or

practices to a faith, or the validity of particular litigant's interpretations of

those creeds[,]" *McEachin,* 357 F.3d at 201 (quoting *Hernandez v.*

*Comm'r of Internal Revenue,* 490 U.S. 680, 699, 109 S. Ct. 2136, 2148-49

(1989)), and instead may only consider whether the particular plaintiff

holds a belief which is religious in nature.  *Ford,* 352 F.3d at 590; *King,*

2007 WL 1017102, at *4.  Once a plaintiff has made this showing, the

burden then shifts to the defendant to identify a legitimate penological

purpose justifying the decision under scrutiny.[12]  *Salahuddin*, 467 F.3d at

474-75; *Livingston v. Griffen*, No. 04-CV-00607, 2007 WL 1500382, at *15

(W.D.N.Y. May 21, 2007).  In the event such a penological interest is

articulated, its reasonableness is then subject to analysis under the test

set out by the Supreme Court in *Turner v. Safley,* 482 U.S. 78, 107 S. Ct.

2254 (1987).  *See Giano v. Senkowski,* 54 F.3d 1050, 1054 (2d Cir.

---

[12]     While this framework is particularly well-suited for analysis of an agency wide or facility policy or practice affecting inmates generally, it applies with equal force to individual decisions such as that involved in this case, which impacts only a single inmate.  *Salahuddin,* 467 F. 3d at 274 n.4.

1995); *Livingston,* 2007 WL 1500382, at *15.

Under *Turner,* the court must determine "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective." *Thornburgh v. Abbott*, 490 U.S. 401, 414, 109 S. Ct. 1874, 1882 (1989). The court then asks whether the inmate is afforded adequate alternative means for exercising the right in question.  *Id.* at 417, 109 S. Ct. at 1884. Lastly, the court must examine "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison." *Id.* at 418, 109 S. Ct. 1884.  Decisions rendered since *Turner* have clarified that when applying this test, a court should examine "the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests."  *Smith v. Nuttal,* No. 04-CV-0200, 2007 WL837111, at *5  (W.D.N.Y. Mar. 14, 2007) (citing *Salahuddin,* 467 F.3d at 274).

In addition to asserting a claim under the First Amendment, plaintiff also includes a cause of action under the RLUIPA.  That Act provides, in pertinent part, that

> [n]o government shall impose a substantial burden
> on the religious exercise of a person residing in or

> confined to an institution . . . . even if the burden
> results from a rule of general applicability, unless
> the government demonstrates that imposition of a
> burden on that person – 1) is in furtherance of a
> compelling governmental interest; and 2) is the
> least restrictive means of furthering that compelling
> governmental interest.

42 U.S.C. § 2000cc-1(a).   Under the RLUIPA, a governmental agency

may not "impose a substantial burden" on religious exercise of prison

inmates, *inter alia*, absent a showing that "that the burden furthers a

compelling governmental interest by the least restrictive means."

*Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (citing 42 U.S.C. §

2000cc-1(a); the principles which inform the analysis of plaintiff's free

exercise claim, while similar to those applicable to plaintiff's potential

RLUIPA cause of action, are not entirely co-extensive, as the two claims

are analyzed under somewhat different frameworks.  *Salahuddin*, 467

F.3d at 274.

      1.    <u>Rabbi Kellman</u>

Plaintiff's complaint does not clearly delineate which of the

defendants are implicated in the various claims asserted.  At Great

Meadow, decisions regarding whether an inmate should be permitted to

convert to any particular religion are entrusted to the chaplin staff.

22

Greene Decl. (Dkt. No. 99-3) ¶ 7.  In their motion, defendants apparently claim that for this reason, plaintiff's First Amendment and RLUIPA claims are only asserted against Rabbi Kellman.  Accordingly, while they argue that defendant Kellman cannot be held accountable under section 1983 since he is not a state actor, they do not address the merits of plaintiff's religious deprivation claims.

Conspicuously absent from defendants' motion is an affidavit from Rabbi Kellman indicating the nature of his affiliation with the DOCS and outlining his duties and responsibilities as the Rabbi designated to Great Meadow.  The record discloses that in keeping with his self-imposed practice, before signing off on plaintiff's conversion request Rabbi Kellman desired to interview the plaintiff to determine the sincerity of his beliefs and whether, consistent with the doctrinal principles associated with the faith, he would permit the desired conversion.[13]

Undeniably, in performing his duties at Great Meadow defendant Kellman is an employee or agent of the DOCS.  *See Montano v.*

---

[13]     As a general rule, under accepted dogma a person is considered of the "Jewish" faith only if born to a Jewish mother or formally converted by a Rabbi.  See *Tripp v. Donovan*, No. 97 CIV. 4579, 1998 WL 338090, at *3 n.2 (S.D.N.Y. June 24, 1998) (citing Solomon Ganzfried, *Code of Jewish Law* (Hyman E. Goldin Trans., Hebrew Publishing Co. 1963)).

*Hedgepeth*, 120 F.3d 844, 846 n.3 (8th Cir. 1997).  This fact alone,

however, does not necessarily mean that his conduct implicates state

action.  *Id.* at 848-49.  To the extent that, when ruling upon plaintiff's

request for conversion, Rabbi Kellman "was acting as a cleric enforcing

religious dogma[,]", however, he cannot be considered to have been

acting under color of state law for purposes of liability under 42 U.S.C. §

1983.  *Tripp v. Donovan,* No. 97 Civ. 4579, 1998 WL 338090, at *3

(S.D.N.Y. June 24, 1998); *Montano,* 120 F.3d at 850.  I therefore

recommend dismissal of plaintiff's religious deprivation claims against

defendant Kellman as a matter of law.

### 2.    Remaining Defendants

Liberally construed, plaintiff's complaint expands his religious

deprivation claims beyond Rabbi Kellman to also extend to

Superintendent Greene and others at the Great Meadow.  While the

argument is not limited to plaintiff's religious claims, defendants,

maintaining that their actions toward the plaintiff were reasonable under

the circumstances, invoke qualified immunity from suit.

Qualified immunity shields government officials performing

discretionary functions from liability for damages "insofar as their conduct

24

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982) (citations omitted). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law."  *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir. 1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir. 1996)); *see also Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007); *Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007).  The law of qualified immunity seeks to strike a balance between overexposure by government officials to suits for violations based upon abstract rights and an unduly narrow view which would insulate them from liability in connection with virtually all discretionary decisions. *Locurto v. Safir*, 264 F.3d 154, 162-63 (2d Cir. 2001); *Warren*, 196 F.3d at 332.  As the Second Circuit has observed,

> [q]ualified immunity serves important interests in our political system, chief among them to ensure that damages suits do not unduly inhibit officials in the discharge of their duties by saddling individual officers with personal monetary liability and harassing litigation.

*Provost v. City of Newburgh*, 262 F.3d 146, 160 (2d Cir. 2001) (internal

quotations omitted) (citing, *inter alia*, *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 456 F.2d 1339, 1348 (2d Cir. 1972)).

Qualified immunity analysis involves a three step inquiry.  *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211 (2d Cir. 2003).  As a threshold matter it must first be determined whether, based upon the facts alleged, plaintiff has facially established a constitutional violation.  *Id.*; *Gilles v. Repicky*, 511 F.3d 239, 243-44 (2d Cir. 2007).  If the answer to this inquiry is in the affirmative, the court must then turn its focus to whether the right in issue was clearly established at the time of the alleged violation.  *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S. Ct. 2151, 2156 (2001)); *see also Poe v. Leonard*, 282 F.3d 123, 132-33 (2d Cir. 2002).  Finally, if the plaintiff had a clearly established, constitutionally protected right that was violated, he or she must demonstrate that it was not objectively reasonable for the defendant to believe that his action did not violate such law.  *Harhay*, 323 F.3d at 211; *Poe*, 282 F.3d at 133 (quoting *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) (quoting, in turn, *Salim*, 93 F.3d at 89)).

The right of an inmate to the practice of religion without substantially

undue burden was clearly established at the relevant times in this action. *See Salahuddin,* 467 F.3d at 275-76. The question remains to whether, despite this fact, it was objectively reasonable for the defendants to believe that their actions did not violate plaintiff's rights under those provisions. In this instance I recommend a finding, as a matter of law, that it was. It appears clear from the record that any delay in permitting the plaintiff to attend Jewish congregate religious services and to provide him with a kosher diet stems from deference to Rabbi Kellman's determination regarding Koehl's request for conversion. Under these circumstances I recommend that plaintiff's religious deprivation claims against remaining defendants be dismissed on the basis of qualified immunity.[14] *Johnson v. Guiffere*, No. 9:04-CV-57, 2007 WL 3046703 (N.D.N.Y. Oct. 17, 2007); *but see Ford v. McGinnis*, 352 F.3d 582, 597-98 (2d Cir. 2003) (holding that reliance upon advice of religious authorities is not always "objectively reasonable.").

---

[14]     As was previously discussed, plaintiff's religious deprivation claims extend to include the denial over a period of a week of a cold alternative diet based upon his failure to comply with mess hall directives. Because that deprivation was related to legitimate penological concerns, and did not amount to a substantial burden on plaintiff's religious exercise, it does not support a claim of religious interference under either the First Amendment or the RLUIPA. *See Salahuddin*, 467 F.3d at 374-75.

C.   Harassment

Much of plaintiff's complaint is focused upon verbal harassment which he received at the hands of various of the defendants.  Among the allegations in support of this claim is his contention that expletives with derogatory, religious overtones were directed toward him by prison officials during the course of his confinement.  Defendants seek dismissal of plaintiff's verbal harassment claims as implicating conduct which is not actionable under 42 U.S.C. § 1983.

Undeniably plaintiff's allegations, if substantiated, reveal conduct which is both offensive and should not be tolerated in a workplace or prison setting.  Nonetheless, it is well established that such conduct, absent more, does not suffice to establish a constitutional deprivation. *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (per curiam). Accordingly, I recommend that the portion of defendants' motion attacking plaintiff's harassment claims based upon legal insufficiency be granted, and those claims dismissed.

D.   False Misbehavior Reports

Also included among plaintiff's claims are those related to the issuance of false misbehavior reports.  Arguing both that the claims are

28

unsubstantiated, particularly in view of plaintiff's admission of certain of

the violations set forth in those misbehavior reports, and that in any event

such allegations do not rise to a level of constitutional significance,

defendants seek their dismissal.

Standing alone, the mere allegation that a false misbehavior report

has been filed against an inmate does not implicate constitutional

conduct. *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997); *Freeman*

*v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982,

108 S. Ct. 1273 (1988)).  The further assertion that the false misbehavior

report has been prompted by retaliatory animus and relates to an inmate

having engaged in protected activity, however, can suffice to state a claim

for unlawful retaliation.  *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988).

Under these circumstances I recommend that's plaintiff's claims related to

the issuance of false misbehavior reports, as distinct from his contention

that he has been unlawfully retaliated against for engaging in protected

activity, be dismissed as a matter of law.

E.    Retaliation

Plaintiff asserts that the issuance by certain defendants of false

misbehavior reports against him is directly attributable to retaliatory

animus based upon his having lodged complaints and grievances regarding defendants' actions toward him.  Noting the ease with which such claims are stated by prison inmates, defendants seek dismissal of this cause of action as well.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies.  *See Franco*, 854 F.2d at 588-90.  As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care."  *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants

took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Dawes*, 239 F.3d at 492 (2d Cir. 2001).  If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct."  *Mount Healthy*, 429 U.S. at 287, 97 S. Ct. at 576.  If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone.  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two.  When such claims, which are exceedingly case-specific, are alleged in only conclusory fashion, and are not supported by evidence

31

establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims. *Flaherty*, 713 F.2d at 13.

It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).   As is true of other types of claims, this principle applies to causes of action claiming unlawful retaliation. *See Abascal v. Hilton*, No. 04-CV-1401, 2008 WL 268366, at *10 (N.D.N.Y. Jan. 30, 2008) (Kahn, D.J. and Lowe, M.J.).

As District Judge David N. Hurd recognized in his decision in *Barclay v. New York*, 477 F. Supp. 2d 546 (N.D.N.Y. 2007), in cases

32

involving allegations of retaliation based on the filing of allegedly false

misbehavior reports, "[t]he difficulty lies in establishing a retaliatory

motive." *Barclay*, 477 F. Supp. 2d at 558.  More than conclusory

allegations are required to survive a summary judgment motion; the "types

of circumstantial evidence that can show a causal connection between the

protected conduct and the alleged retaliation include temporal proximity,

prior good discipline, finding of not guilty at the disciplinary hearing, and

statements by defendants as to their motives."  *Id.*  (citations omitted).

 I have scoured the record now before the court in an effort to find

proof from which a reasonable factfinder could conclude that the issuance

to plaintiff of allegedly misbehavior reports was motivated by his filing of

various grievances complaining of the actions of prison officials.  Despite

that survey I have been unable to locate, nor has plaintiff cited, any

evidence which would tend to establish the requisite nexus.  In any event

defendants have established, particularly in view of plaintiff's admissions

of violations associated with both the October 2003 misbehavior report

and that issued in February of 2004, that the charges contained within

them were not lacking in merit, and even absent any potential retaliatory

motivation they would have taken the same actions against the plaintiff,

thus satisfying their burden under *Mount Healthy* to establish independent grounds for the issuance of those misbehavior reports now attributed to retaliatory animus.  Accordingly, I recommend dismissal of all claims arising out of the issuance of misbehavior reports to the plaintiff.

>     F.    Conspiracy

Plaintiff's complaint also alleges, in conclusory fashion bereft of supporting details, a claim of conspiracy.  Defendants similarly seek dismissal of this cause of action.

To sustain a conspiracy claim under § 42 U.S.C. 1983, a plaintiff must demonstrate that a defendant "acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights . . . secured by the Constitution or the federal courts." *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995) (citations and internal quotation marks omitted).  Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983.  *See Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir.), *cert. denied*, 464 U.S. 857, 104 S. Ct. 177 (1983).

Neither plaintiff's complaint nor the record before the court provides the identity of the parties to the alleged conspiracy, a showing of

agreement or a "meeting of the minds", or any details as to the time and place of conspiracy or its objective.  Such deficiencies are fatal to plaintiff's conspiracy claim.  *Warren v. Fischl,* 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999).  Because plaintiff has asserted claims of conspiracy in only vague and conclusory terms, and has failed to come forward, in the face of defendants' summary judgment motion, with evidence to support such a conspiracy claim, I recommend its dismissal as a matter of law. *See Polur v. Raffe*, 912 F.2d 52, 56 (2d Cir. 1990), *cert. denied*, 499 U.S. 937, 111 S. Ct. 1399 (1991); *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987).

As a separate and independent basis for dismissing that claim, defendants assert that it is legally precluded because all of the alleged co-conspirators are DOCS affiliates.  In a doctrine rooted in the conspiracy provision of section one of the Sherman Antitrust Act, 15 U.S.C. § 1, and which, although developed in the context of business entities, since inception has been expanded to apply to business corporations and public entities as well, the intra-corporate conspiracy doctrine provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a

conspiracy claim conceptually will not lie in such circumstances.  *See,*
*e.g., Everson v. New York City Transit Auth.*, 216 F. Supp. 2d 71, 75-76
(E.D.N.Y. 2002); *Griffin-Nolan v. Providence Washington Ins. Co.*, No.
5:05CV1453, 2005 WL 1460424, at *10-11 (N.D.N.Y. June 20, 2005)
(Scullin, C.J.).  Since plaintiff's conspiracy claim in this action is asserted
against various DOCS agents or employees, each acting within the scope
of his or her employment, it is precluded by virtue of the intra-corporate
conspiracy doctrine. *Little v. City of New York,* 487 F. Supp. 2d 426, 441-
42 (S.D.N.Y. 2007) (citations omitted).

IV.   <u>SUMMARY AND RECOMMENDATION</u>

While plaintiff's complaint contains assorted constitutional and
federal statutory claims, those which appear to be potentially supported by
the record are lacking in merit.  Because plaintiff's religious deprivation
claims implicate the delay of Rabbi Kellman in approving his request for
conversion in order to insure that the controlling doctrinal requirements of
the Jewish faith were met, and in that respect Rabbi Kellman was not
engaged in state action, plaintiff's religious deprivation claims are subject
to dismissal as a matter of law.  To the extent that plaintiff's religious
deprivation claims extend beyond Rabbi Kellman to the remaining

defendants, those parties are entitled to qualified immunity based upon the court's finding that as a matter of law it was reasonable for the defendants to defer the decision regarding conversion to Rabbi Kellman, based upon the implication of religious dogma.

Plaintiff's claims alleging the issuance of false misbehavior reports and verbal harassment are insufficient to support a claim under section 1983. While the issuance of a false misbehavior report may support a claim of retaliation, in this instance the record is lacking in any evidence to link those reports to protected activity, and in any event defendants have sustained their burden of demonstrating that even but for any potential retaliatory animus those misbehavior reports would nonetheless have been issued. Turning to plaintiff's conspiracy claim, I find that it is subject to dismissal based both upon his failure to plead and prove the existence of a conspiracy and independently on the ground of the intra-corporate conspiracy doctrine.

Accordingly, I recommend that defendants' motion be granted and plaintiff's complaint be dismissed, and find it unnecessary to additionally address the issues of mootness, based upon plaintiff's transfer out of Great Meadow, in connection with his request for injunctive relief, as well

37

as the allegation that he is not entitled to recover compensatory

damages.[15]  Accordingly, it is hereby

RECOMMENDED that defendants' motion for summary judgment

(Dkt. No. 99) be GRANTED, and that plaintiff's complaint be DISMISSED

in its entirety.

NOTICE:  pursuant to 28 U.S.C. § 636(b)(1), the parties have ten

(10) days within which to file written objections to the foregoing report-

recommendation.  Any objections shall be filed with the clerk of the court.

FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL

PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ.

P. 6(a), 6(e), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

---

[15]    Plaintiff's complaint also alleges the deprivation of due process. Discerning no basis from plaintiff's complaint to conclude that he has been denied a cognizable liberty interest sufficient to trigger the procedural process requirements of the Fourteenth Amendment, *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 1999), I have not addressed this claim and assume that his due process cause of action is instead lodged as a substantive due process denial associated with his religious exercise claims.

It is further ORDERED that the Clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      September 18, 2008
            Syracuse, NY